# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530-0001<br><br>THE STATE OF MARYLAND,<br>200 St. Paul Place<br>Baltimore, MD 21202<br>Baltimore County<br><br>*ex rel.* [UNDER SEAL],<br><br>               Plaintiffs,<br><br>      v.<br><br>[UNDER SEAL],<br><br>               Defendants. | **Complaint for a Civil Case**<br><br>Case No. _____  18 CV 3631<br><br>**FILED UNDER SEAL**<br>**As required by 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT PLACE ON PUBLIC DOCKET**<br>**DO NOT PLACE IN PRESS BOX**<br><br>**Jury Trial Demanded** |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

THE STATE OF MARYLAND,
200 St. Paul Place
Baltimore, MD 21202
Baltimore County

*ex rel.* TUESDAY WILLIAMS,

                        Plaintiffs,

         v.

REGIONAL CANCER CARE ASSOCIATES
LLC D/B/A THE CENTER FOR CANCER
AND BLOOD DISORDERS,
6410 Rockledge Drive, Suite 660
Bethesda, MD 208017
Montgomery County

19735 Germantown Road, Suite 225
Germantown, MD 20874
Montgomery County

and

RALPH V. BOCCIA, M.D.,

                        Defendants.

**Complaint for a Civil Case**

**Case No.** _____

**FILED UNDER SEAL**
**As required by 31 U.S.C. § 3730(b)(2)**

**DO NOT PLACE ON PUBLIC DOCKET**
**DO NOT PLACE IN PRESS BOX**

**Jury Trial Demanded**

1.      Plaintiff-relator Tuesday Williams ("Relator") brings this action on behalf of the United States of America and the State of Maryland against Regional Cancer Care Associates LLC d/b/a The Center for Cancer and Blood Disorders, and Ralph V. Boccia, M.D. (together, "CCBD" or the "Defendants") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "Federal FCA") and the Maryland False Health Claims Act, Md. Code Ann., Health-General § 2-601 *et seq.* (the "Maryland FHCA"), to recover millions of dollars that Defendants have caused the government healthcare programs, including Medicare and Medicaid, to pay for anemia drugs that were specifically excluded from coverage under applicable law and that exposed patients to substantial and unnecessary health risks including increased mortality.

## I.      INTRODUCTION

2.      CCBD, a Maryland-based private oncology practice, has engaged in a multi-year scheme to circumvent requirements of Medicare and other statutes and regulations designed to protect cancer patients from potentially life-threatening risks caused by a class of anemia drugs called erythropoiesis-stimulating agents ("ESAs"). These drugs include Procrit, a drug marketed by Johnson & Johnson ("J&J") and Aranesp, a drug marketed by Amgen. ESAs are approved by the FDA for the treatment of anemia caused by chemotherapy, anemia caused by chronic kidney disease ("CKD") of Stage 3 or higher, and for certain other indications. Over the past decade, Medicare has paid billions of dollars annually for these ESAs.

3.      After clinical studies demonstrated that ESAs were associated with an increased risk of cancerous tumor growth and overall mortality, the FDA in March 2007 responded by taking the unusual step of issuing a Black Box Warning for these drugs. Such a warning is reserved only for those FDA-approved drugs carrying the greatest risks to the patient. The Black Box Warning advised, among other things, that the lowest dose of ESAs should be used for all

1

indications and that ESA use "shortened the time to tumor progression," "shortened overall survival," and "increased the risk of death" in certain cancer patients.

4.      In July 2007, Medicare went still further and issued a National Coverage Determination (the "2007 NCD") that expressly restricted the approved usage of ESAs in cancer patients.  In particular, the 2007 NCD made clear that Medicare reimbursement for ESAs was only allowed when a cancer patient's chemotherapy-induced anemia was substantial and satisfied specific clinical parameters, and then only for a limited period of time, either until the patient's hemoglobin level reached 10g/dL or in any event, no more than eight weeks after the cessation of chemotherapy. These unusually exacting requirements reflect the serious and life-threatening health risks these drugs posed to cancer patients.

5.      The 2007 NCD posed a substantial and immediate threat to the profits that CCBD enjoyed from its use of ESAs in treating chemotherapy-induced anemia.  CCBD obtained its supply of ESAs from drug manufacturers at prices materially below the Medicare reimbursement rate, providing it with considerable profits on each use.  In response to the 2007 NCD, CCBD embarked on a scheme to intentionally circumvent the new restrictions by administering ESAs to its cancer patients with active cancer and hemoglobin levels above 10g/dL, often continuing for many months after the cessation of chemotherapy.  CCBD accomplished this fraud by switching its diagnosis of its cancer patients from anemia caused by chemotherapy to anemia caused by Stage 3 (or higher) chronic kidney disease, to protect its flow of Medicare revenue whenever the patient fell outside of the scope of the 2007 NCD coverage.  CCBD would then continue to treat these cancer patients with ESAs past the time when Medicare no longer covered ESA treatment for chemotherapy-induced anemia by claiming that the patient's supposed CKD (and not

chemotherapy, as it previously represented) was causing the patient's anemia and that ESAs were reasonable and necessary to treat the patient's asserted condition.

6. This unlawful scheme reflected several facts:

- the FDA indication for administrating ESAs for anemia caused by CKD had no time limitation as did the indication for anemia caused by chemotherapy;

- the hemoglobin cutoff level was higher for the CKD-induced anemia indication than the 10g/dL level for the chemotherapy-induced anemia indication;

- oncologists have less experience as a general matter diagnosing and treating CKD patients than do nephrologists; and

- Medicare only reimbursed for anemia caused by CKD when the CKD was Stage 3 (moderate) or higher.

7. As explained herein, CCBD caused many cancer patients to be falsely diagnosed with anemia caused by CKD when they did not have the required condition of Stage 3 CKD, if indeed they had CKD at all. The gold standard for determining whether a patient has Stage 3 CKD is the patient's glomerular filtration rate ("GFR") as measured at least twice over three months. The GFR, in layperson's terms, identifies how efficiently the patient's kidneys function to remove toxins from the blood. CCBD represented on Medicare claims forms that its cancer patients had CKD Stage 3 or higher when the patients' clinical data, such as their GFR, did not support or in fact contradicted that diagnosis. Nevertheless, these patients were falsely diagnosed by CCBD as having CKD Stage 3 solely to obtain Medicare reimbursement for ESAs such as Procrit to which it was not entitled.

8. As a consequence of Defendants' deliberate and heretofore successful scheme, the government was defrauded into paying millions of dollars for ESA claims that it had expressly disallowed under the 2007 NCD and that were being falsely attributed to a condition the patient did not have. Countless cancer patients were thereby exposed to life-threatening health risks

from ESAs that the government had specifically sought to eliminate from the treatment regimen of these patients.

## II.    JURISDICTION & VENUE

9.    Jurisdiction is founded upon the Federal FCA, 31 U.S.C. §§ 3729 *et seq.*, specifically 31 U.S.C. §§ 3732(a) & (b) and also 28 U.S.C. §§ 1331 & 1345. The Court may exercise personal jurisdiction over Defendants because they transact business in this District and are engaging in the alleged illegal activities and practices in this District.

10.    Venue in the District of Maryland is appropriate under 31 U.S.C. § 3732(a), in that many of the acts complained of took place in this District.

11.    This Court has supplemental jurisdiction over the state law claims alleged in this action under 31 U.S.C. § 3732(b).

## III.    PARTIES

12.    The United States and the State of Maryland are the real parties in interest to the claims of this action.

13.    Plaintiff-relator Tuesday Williams is a trained healthcare reimbursement and policy professional with more than two decades of experience handling public and private third-party healthcare reimbursement issues. Relator earned a Bachelor of Science from Howard University and has received training at the University of Michigan Ross School of Business and the Rutgers Center for Management Development.  For more than 16 years, Relator worked for Johnson & Johnson where she held a variety of positions, including product specialist, reimbursement manager, business solutions group director, healthcare solutions manager, and business specialist. Relator currently operates her own professional services firm, providing consulting services on healthcare reimbursement issues to private and public insurance agencies.

14.     Defendant Regional Cancer Care Associates LLC d/b/a The Center for Cancer and Blood Disorders is a Maryland-based private oncology practice with offices in 6410 Rockledge Drive, Suite 660, Bethesda, MD 208017, and 19735 Germantown Road, Suite 225, Germantown, MD 20874.  The corporate address of Regional Cancer Care Associates LLC is 100 First Street, Suite 301, Hackensack, NJ 07601.

15.     Defendant Ralph V. Boccia is an oncologist and founder of CCBD.  At all relevant times  defendant Boccia has  also been Director of the International Oncology Network ("ION") Clinical Research Program and chairman of ION's Medical Advisory Panel.  ION is a large group purchasing organization (GPO) that coordinates and consolidates the buying power of individual oncology practices.

### IV.  LEGAL BACKGROUND

**A.     The Federal False Claims Act and Maryland False Health Claims Act**

16.     The Federal FCA imposes liability on:

[A]ny person who—

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
* * *
(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]

31 U.S.C. §§ 3729(a)(1)(A), (B) & (G).

17.     The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Proof of specific intent to defraud is not required. *See* 31 U.S.C. § 3729(b)(1)(B).

18.     Section 3729(a)(1) of the Federal FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (note), 64 Fed. Reg. 47099, 47103 (1999), and 28 C.F.R. § 85.3 (2015), the Federal FCA civil penalties were adjusted to $5,500 to $11,000 per violation for violations occurring on or after October 23, 1996. In accordance with the Federal Civil Penalties Inflation Adjustment Act of 2015, those same Federal FCA civil penalty amounts were made applicable to all violations occurring on or before November 2, 2015. See 28 C.F.R. §§ 85.3 & 85.5 (2016); 81 Fed. Reg. 42491, 42500 (2016).  In accordance with the Bipartisan Budget Act of 2015, 28 U.S.C. § 2461 (note) (2015), the Department of Justice has annually adjusted the penalties applicable to violations occurring after November 2, 2015 and assessed or enforced after August 1, 2016.  As of the filing of this Complaint, the Federal FCA civil penalty amounts have been adjusted for violations occurring after November 2, 2015 and assessed or enforced after January 29, 2018 to $11,181 to $22,363 per violation. 28 C.F.R. § 85.5 (2018).

19.     The Maryland FHCA provides, in pertinent part, that a person may not:

(1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;
***

(8) Knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State; or

(9) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

Md. Code Ann., Health-General §§ 2-602(a)(1), (2), (8) & (9).

20.     Section 2-602(b) of the Maryland FHCA provides that a person is liable to the State for up to $10,000 for each violation under Section 2-602(a) and an additional amount of up to three times the amount of damages that the State sustains as a result of the fraudulent acts of that person.

21.     The Maryland FHCA provides that the term "knowing" or "knowingly" means "with respect to information and without requiring proof of specific intent to defraud, that a person":

(i) Has actual knowledge of the information;

(ii) Acts in deliberate ignorance of the truth or falsity of the information; or

(iii) Acts in reckless disregard of the truth or falsity of the information.

Md. Code Ann., Health-General § 2-601(f)(1).

## V.     MEDICARE AND OTHER GOVERNMENT PROGRAMS

### A.     Medicare Coverage For Biologicals And Prescription Drugs

22.     Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426 & 426a.

23.     The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services and services for patients with end-stage renal disease (ESRD).  Medicare pays hospitals and ESRD providers a bundled rate under

its prospective payment system (PPS) that includes the provision of ESAs.  Medicare Benefit Policy Manual, ch. 11 § 20.3.

24.     Medicare Part B generally covers outpatient physician services, including biologicals and prescription drugs administered "incident to" physician services.  Medicare Benefit Policy Manual, ch. 15 § 50.  The Part B reimbursement amount is generally determined by reference to the drug's Average Sales Price ("ASP"), a price which the government calculates based on quarterly price information that the drug manufacturer provides to CMS.  The Part B reimbursement amount is generally 80% of the ASP plus 6%.  The patient is responsible for the remaining 20% of ASP, which for qualifying patients is reimbursed by Medicaid.  Procrit and Aranesp were the highest-expenditure drugs for Medicare Part B in 2010, costing nearly $3 billion in that year alone.[1]

25.     Medicare Part C provides for private companies to offer "Medicare Advantage" plans that include, at a minimum, all benefits covered by Parts A and B.  Medicare pays a fixed monthly amount per beneficiary to the private companies that offer Medicare Advantage plans.[2]

26.     Medicare Part D provides coverage for certain prescription drugs.  In order to be covered by Part D, the drugs generally must be dispensed only upon a prescription and for a medically-acceptable indication.  Medicare Prescription Drug Benefit Manual, ch. 6 § 10.1.

27.     At all relevant times, ESAs were available for reimbursement under Medicare Parts A, B, C, and D.

---

[1] "Information on Highest-Expenditure Part B Drugs," United States Government Accountability Office at p. 5 (June 28, 2013), available at http://www.gao.gov/products/GAO-13-739T (last visited Nov. 6, 2018).

[2] "How do Medicare Advantage Plans work?," Medicare.gov, available at https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans/how-do-medicare-advantage-plans-work (last visited Nov. 6, 2018).

28.     Medicare only covers services or goods that are reasonable and necessary, and that meet professionally recognized standards of health care.  42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1320c-5(a)(2).

29.     In order to assess the reasonableness and necessity of those services and whether payment is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that: "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period."  42 U.S.C. § 1395l(e).

30.     Practitioners and providers are obligated to assure that the services:

(1)     will be provided economically and only when, and to the extent, medically necessary;
(2)     will be of a quality which meets professionally recognized standards of health care; and
(3)     will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing quality improvement organization in the exercise of its duties and responsibilities.

42 U.S.C. § 1320c-5(a).

31.     Other government healthcare programs also cover ESAs, including TRICARE, the FEHBP, the FECP, the VA health care program, the Indian Health Service, and the Federal Bureau of Prisons.  In addition, Maryland Medicaid covers ESAs both by paying the Medicare

co-payments for dual-eligible beneficiaries[3] and as part of its outpatient drug benefit.[4]  The

programs referenced in this paragraph, with Medicare, are herein referred to as the "government

healthcare programs."

## VI.   THE DEVELOPMENT AND USE OF ESAs, AND THEIR REGULATION AND REIMBURSEMENT BY THE GOVERNMENT

### A.      Erythropoiesis-Stimulating Agents (ESAs)

32.      Procrit and Aranesp are the U.S. brand names for Johnson & Johnson's and

Amgen's versions of the drugs *epoetin alfa* and *darbepoetin alfa*, respectively.  Both drugs are

erythropoiesis-stimulating agents used to treat anemia.[5]  Erythropoiesis is the process by which

healthy kidneys produce the hormone erythropoietin, which in turn stimulates bone marrow

production of red blood cells.

33.      Anemia of cancer and chronic kidney disease is a condition in which the body

produces a lower than normal number of red blood cells.  Red blood cells contain hemoglobin, a

protein molecule that carries oxygen through the body's circulatory system.  Individuals with

anemia typically suffer from fatigue resulting from a shortage of oxygen flowing to their body's

tissues.

34.      Anemia is the most common blood condition in the U.S., affecting approximately

3.5 million individuals, and has a number of different causes.

---

[3] "Dual Eligible Beneficiaries Under the Medicare and Medicaid Programs," Centers for Medicare & Medicaid Services, at p. 4 (Nov. 2014), available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/Medicare_Beneficiaries_Dual_Eligibles_At_a_Glance.pdf (last visited Nov. 6, 2018).

[4] Procrit and Aranesp are "preferred" drugs under Maryland Medicaid's formulary. *See* https://client.formularynavigator.com/Search.aspx?siteCode=9381489506.

[5] Amgen granted Johnson & Johnson a license to market *epoetin alfa* under the brand name "Procrit" in the United States in all markets other than dialysis. *See* Amgen 2008 Annual Report at 31.

35.     Anemia can be caused by advanced kidney disease, in which the kidneys do not produce erythropoietin in amounts necessary to stimulate a sufficient level of red blood cell production.  Anemia caused by kidney disease is oftentimes a life-long condition.

36.     Anemia frequently occurs as a side effect of chemotherapy treatments, which target rapidly-dividing cells including both cancer cells and healthy stem cells located in bone marrow.  The destruction of stem cells by chemotherapy is called myelosuppression. Anemia caused by chemotherapy is typically a temporary condition.  Cancer patients' hemoglobin levels will often rebound to normal or near normal levels after their chemotherapy treatment ends.

37.     Importantly, the causes of anemia in chemotherapy patients are different from those in chronic kidney disease patients.  While anemia caused by CKD is primarily related to decreased erythropoietin production, anemia caused by chemotherapy is not primarily related to low erythropoietin levels, but is generally the result of the chemotherapy itself.[6] This is one reason the treatment of anemia in chemotherapy patients is approached differently from the treatment of anemia in CKD patients.

38.     The Food and Drug Administration (FDA) first approved Procrit in 1989 and Aranesp in 2001 for the treatment of anemia associated with chronic renal failure.[7]  The FDA

---

[6] *See* FDA Briefing Document, Oncologic Drugs Advisory Committee, at 6 (May 10, 2007) ("In contrast to the etiology of anemia in patients with renal failure, the etiology of anemia in patients with cancer is multifactorial and not primarily the result of low endogenous erythropoietin levels."), available on the FDA's archived website at https://wayback.archive-it.org/7993/20170405053529/https://www.fda.gov/ohrms/dockets/ac/07/briefing/2007-4301b2-02-FDA.pdf.  ("FDA Briefing Doc.") (last visited Nov. 6, 2018).

[7] Chronic kidney disease is the contemporary term for the condition previously referred to as chronic renal failure.

subsequently expanded the approved uses of these drugs to include anemia associated with cancer chemotherapy in 1993 (Procrit) and 2006 (Aranesp).[8]

39.    After the FDA approved ESAs to treat anemia caused by chemotherapy, it has mandated different dosing practices and included different warnings than applied to ESA use treating anemia caused by CKD. This regulatory approach reflected the FDA's understanding that anemia caused by chemotherapy was physiologically distinct from anemia caused by CKD, and also that the use of ESAs such as Procrit when treating patients with active cancer carries with it serious additional risks.

40.    Chronic kidney disease is a condition of decreased kidney function and is categorized by the National Kidney Foundation into five "stages" of progressively severe impairment based on a patient's glomerular filtration rate (GFR).

> Stage 1: evidence of kidney damage but GFR is preserved (>90 mL/min);
> Stage 2: mild kidney damage with GFR 60–90 mL/min;
> Stage 3: moderate kidney damage with GFR 30–59 mL/min;
> Stage 4: severe kidney damage with GFR 15–29 mL/min;
> Stage 5: end stage renal disease (ESRD) with GFR <15 mL/min.

41.    Kidney impairment among U.S. adults is widespread. But having impaired kidney function does not mean a patient will also have anemia as a consequence thereof. Only around 20% of patients with Stage 3 CKD have anemia. Anemia becomes more prevalent as a patient's CKD worsens, with half or more CKD Stage 5 patients developing anemia.[9]

**B.    Clinical Studies Demonstrate That ESAs Increase The Risk Of Tumor Growth And Mortality In Patients With Cancer**

---

[8]  FDA Briefing Doc. at 10 (Procrit); FDA Website at https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm541148.htm (Aranesp) (last visited Nov. 6, 2018).

[9]  *See* Stauffer, et al., "Prevalence of Anemia in Chronic Kidney Disease in the United States" (PLOS ONE 2014) ("The prevalence of anemia increased with stage of CKD, from 8.4% at stage 1 to 53.4% at stage 5," and finding the prevalence of anemia in stage 3 CKD patients was 17.4%.).

42.   In the years following the FDA's approval of ESAs for the treatment of anemia

associated with chemotherapy, clinical studies established a link between the use of ESAs and

increased progression of cancerous tumors and death.

43.   Six trials in particular indicated decreased survival times and/or tumor

progression in cancer patients.[10]

- The Erythropoietin in Head and Neck Cancer (ENHANCE) study "showed evidence of detrimental effects on [cancer patient] survival and tumor outcomes."[11]  Specifically, patients treated with ESAs had shorter locoregional progression free survival, which is defined as "the time to loco-regional tumor progression or death, whichever occurred first."[12]

- The Breast Cancer Erythropoietin Survival Trial (BEST) was "stopped earl[y] in accordance with a recommendation from the Independent Data Monitoring Committee because of higher mortality in the group treated with epoetin alfa."[13]  The interim results of the BEST study were that patients treated with ESAs had shorter one-year overall survival rates as compared to patients administered placebos.[14]

- The AMG 20010103 study concluded that "[l]ong-term survival data demonstrated significantly poorer survival in patients treated with [ESAs] versus placebo."[15]

- The AMG 20000161 study indicated shorter overall survival rates in ESA-treated patients. [16]

---

[10] FDA Briefing Doc. at 6.  *See also* "Effects of erythropoietin receptors and erythropoiesis-stimulating agents on disease progression in cancer," British Journal of Cancer (2012) (discussing clinical trials suggesting increased disease progression and/or mortality in cancer patients on ESAs).

[11] Henke et al., "Erythropoietin to treat head and neck cancer patients with anemia undergoing radiotherapy: randomized, double-blind, placebo-controlled trial," The Lancet (2003).

[12] FDA Briefing Doc at 14, 17, 51-52.

[13] Leyland-Jones et al., "Maintaining Normal Hemoglobin Levels With Epoetin Alfa in Mainly Nonanemic Patients With Metastatic Breast Cancer Receiving First-Line Chemotherapy: A Survival Study," Journal of Clinical Oncology, Abstract (2005).

[14] FDA Briefing Doc. at 18.

[15] Smith et al., "Darbepoetin Alfa for the Treatment of Anemia in Patients With Active Cancer Not Receiving Chemotherapy or Radiotherapy: Results of a Phase III, Multicenter, Randomized, Double-Blind, Placebo-Controlled Study," Journal of Clinical Oncology, Abstract (2008); *see also* FDA Briefing Doc. at 27.

[16] FDA Briefing Doc. at 32, 51-52.

- The EPO-CAN-20 study evaluated non-small cell lung cancer patients randomized to ESA or placebo. The study was performed in collaboration with Ortho Biotech Products, L.P. It was terminated early due to "increased mortality with study drug [ESA]."[17]

- The Danish Head and Neck Cancer-10 (DAHANCA-10 or SE 2002-9001) study "clearly demonstrates an adverse effect on time to tumor progression." This study was terminated prematurely on recommendation by the data monitoring committee due to adverse effects on tumor growth and a trend towards decreased survival.[18]

**C.     The FDA Responds To Clinical Studies Indicating Severe Risks For Cancer Patients By Requiring A Black Box Warning**

44.     On March 9, 2007, in response to the severe risks that ESAs posed to patients

with cancer or who were receiving chemotherapy, the FDA approved a Black Box Warning for

Procrit and Aranesp.

45.     The FDA's 2007 Black Box warning for ESAs included the following

information:

- An instruction to use ESAs sparingly and at all times at the lowest doses that would over time attain the minimally sufficient clinical effect. ("Use the lowest dose that will gradually increase the hemoglobin concentration to the lowest level sufficient to avoid the need for red blood cell transfusion.") (emphasis added).

- A warning that ESAs "increased the risk for death and for serious cardiovascular events" when administered to target a hemoglobin of greater than 12 g/dL" (emphasis added).

- Specific warnings that ESA use "shortened the time to tumor progression," "shortened overall survival and increased deaths attributed to disease progression," and "increased the risk of death" in certain groups of cancer patients (emphasis added).

46.     Even after instituting this Black Box Warning, the FDA continued updating ESA

labels to provide more explicit and detailed directions on their use, and to expand discussion of

the risks to cancer patients from ESAs.

---

[17] *See* ClinicalTrials.gov, U.S. National Institutes of Health, available at
https://clinicaltrials.gov/ct2/show/NCT00310232 (last visited Nov. 6, 2018).

[18] FDA Briefing Doc. at 27-28, 52.

14

47.     Since 2007, the FDA's ongoing scrutiny of ESA use among cancer patients has

led to over a dozen revisions and supplements to the label, including among others:

(a)     On November 8, 2007, the FDA revised the ESA label to state that for cancer
patients, "the risks of shortened survival and tumor progression have not been excluded when
ESAs are dosed to reach a hemoglobin value of <12 g/dL," and included a summary of the
clinical studies that demonstrated these risks. ("Information for Healthcare Professionals:
Erythropoiesis Stimulating Agents (ESA)," FDA Alert (updated Nov. 8, 2007)).

(b)     Also, on November 8, 2007, the FDA approved a patient package insert in
question-and-answer format that answered, "What is the most important information I should
know [about ESAs]?" with "[ESAs] can cause serious side effects." Specifically, the insert
directed that ESA treatment "should be stopped" once a cancer patient's chemotherapy course
was completed.

(c)     On March 7, 2008, the FDA revised the Black Box warning to include as its first
item: "WARNINGS:  INCREASED MORTALITY, SERIOUS CARDIOVASCULAR and
THROMBOEMBOLIC EVENTS[19], and TUMOR PROGRESSION."

(d)     On June 24, 2011, the FDA issued more restrictive recommendations on dosing of
ESAs in patients with chronic kidney disease; specifically, the FDA replaced its
recommendation to target Hg in a range from 10-12 g/dL with a new recommendation to only
start Procrit treatment at Hg < 10 and to refrain from targeting a hemoglobin level of 10 or
above. ("FDA Drug Safety Communication:  Modified dosing recommendations to improve
the safe use of Erythropoiesis-Stimulating Agents (ESAs) in chronic kidney disease," Safety
Announcement, U.S. Food & Drug Administration (Jun. 24, 2011).)

**D.     CMS Response:  2007 NCD Restricting ESA Use On Cancer Patients**

48.     In response to growing safety concerns about ESA use in cancer patients, and in

the wake of the FDA's Black Box Warning on ESAs, CMS initiated the administrative process

of issuing a National Coverage Determination (NCD) on ESA treatment for cancer patients.

---

[19] Thromboembolism is the formation of a blood clot (a thrombus) that blocks the flow of blood in a
blood vessel, a condition that can cause disease and death.

49.     NCDs are evidence-based processes that express the determination of CMS on whether a service or product is "reasonable and necessary for the diagnosis or treatment of an illness or injury," and covered by Medicare.[20]

50.     CMS opened a National Coverage Analysis for ESA use in cancer patients on March 14, 2007, and issued a Proposed Coverage Decision Memorandum on May 14, 2007.[21]

51.     The Proposed Coverage Decision Memorandum included a number of substantial restrictions to Medicare coverage for ESAs, including generally that ESA use for patients undergoing chemotherapy only be initiated when hemoglobin levels are < 9 g/dL, and that ESA use be discontinued if the patient experiences either very small or very large increases in hemoglobin levels within defined time periods.[22]

52.     CMS received 2,641 comments during the open comment period on the proposed Coverage Decision Memorandum, and issued its final NCD and an associated final Decision Memorandum on July 30, 2007.[23]

---

[20] *See* "Medicare Coverage Determination Process," CMS website, available at https://www.cms.gov/Medicare/Coverage/DeterminationProcess/ (last visited Nov. 6, 2018).

[21] Press Release, "Medicare Issues Proposed Coverage Decision On Erythropoiesis Stimulating Agents," CMS (May 14, 2007), available at https://www.cms.gov/newsroom/press-releases/medicare-issues-proposed-coverage-decision-erythropoesis-stimulating-agents (last visited Nov. 6, 2018). The proposed NCD is available at http://www.cms.gov/medicare-coverage-database/details/nca-proposed-decision-memo.aspx?&NcaName=Erythropoiesis%20Stimulating%20Agents%20&bc=BEAAAAAAIAAA&NCAId=203&ver=12& (last visited Nov. 6, 2018).

[22] The Proposed Coverage Decision Memorandum also included outright prohibitions on ESA use on patients with anemia caused by certain cancers and cancer treatments.

[23] "Decision Memo for Erythropoiesis Stimulating Agents (ESAs) for non-renal disease indications (CAG-00383N),) CMS website (July 30, 2007), available at http://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=203&ver=12&NcaName=Erythropoiesis+Stimulating+Agents+&bc=BEAAAAAAIAAA& (last visited Nov. 6, 2018) ("CMS Final Decision Memo"); "National Coverage Determination (NCD) for Erythropoiesis Stimulating Agents (ESAs) in Cancer and Related Neoplastic Conditions (110.21)," CMS website (July 30, 2007), available at http://www.cms.gov/medicare-coverage-database/details/ncd-

16

53.     In its Decision Memorandum, CMS explained that it had originally proposed

restricting ESA use on cancer patients to those who had a hemoglobin level < 9 g/dL at the start

of ESA therapy, but in response to concerns raised by commenters, CMS ultimately determined

that ESA use would be reasonable and necessary (and therefore covered by Medicare) for cancer

patients with hemoglobin levels < 10 g/dL immediately prior to initiation or maintenance of ESA

treatment.

54.     The Decision Memorandum also explained the basis for the restrictions included

in the 2007 NCD that ESA use be discontinued in the event that certain changes to the patient's

hemoglobin levels occur.[24]

55.     The Decision Memorandum concluded that ESA treatment was no longer covered

by Medicare after 8 weeks following the end of a patient's chemotherapy regimen.

56.     The 2007 NCD, effective as of July 30, 2007, states:

---

details.aspx?NCDId=322&ncdver=1&NCAId=203&ver=12&NcaName=Erythropoiesis+Stimulating+Ag
ents+&bc=BEAAAAAAIAAA& (last visited Nov. 6, 2018).

[24] Specifically, "If the rise in hemoglobin is < 1g/dL (hematocrit < 3%) for 8 weeks in spite of a 25%
increase in dose, ESA treatment should be discontinued. If after any 2-week period of time, the
hemoglobin rise is > 1g/dL (hematocrit > 3%), then ESA treatment should be discontinued unless the
hemoglobin is < 10 g/dL (hematocrit < 3 0%) at which time ESA treatment may be reinstituted at a dose
reduction of 25%."

**Indications and Limitations of Coverage**

**B.   Nationally Covered Indications**

ESA treatment for the anemia secondary to myelosuppressive anticancer chemotherapy in solid tumors, multiple myeloma, lymphoma, and lymphocytic leukemia is only reasonable and necessary under the following specified conditions:

- The hemoglobin level immediately prior to initiation or maintenance of ESA treatment is < 10 g/dL (or the hematocrit is < 30%).
- The starting dose for ESA treatment is the recommended FDA label starting dose, no more than 150 U/kg/3 times weekly for epoetin and 2.25 mcg/kg/1 time weekly for darbepoetin alpha. Equivalent doses may be given over other approved time periods.
- Maintenance of ESA therapy is the starting dose if the hemoglobin level remains below 10g/dL (or hematocrit is < 30%) 4 weeks after initiation of therapy and the rise in hemoglobin is ≥ 1g/dL (hematocrit ≥ 3%).
- For patients whose hemoglobin rises < 1g/dl (hematocrit rise < 3%) compared to pretreatment baseline over 4 weeks of treatment and whose hemoglobin level remains < 10g/dL after the 4 weeks of treatment (or the hematocrit is < 30%), the recommended FDA label starting dose may be increased once by 25%. Continued use of the drug is not reasonable and necessary if the hemoglobin rises < 1g/dl (hematocrit rise < 3%) compared to pretreatment baseline by 8 weeks of treatment.
- Continued administration of the drug is not reasonable and necessary if there is a rapid rise in hemoglobin > 1g/dl (hematocrit > 3%) over 2 weeks of treatment unless the hemoglobin remains below or subsequently falls to < 10g/dL (or the hematocrit is < 30%). Continuation and reinstitution of ESA therapy must include a dose reduction of 25% from the previously administered dose.
- ESA treatment duration for each course of chemotherapy includes the 8 weeks following the final dose of myelosuppressive chemotherapy in a chemotherapy regimen.

57.   CMS developed a billing process to implement the restrictions in the 2007 NCD that required providers to indicate on their claim to Medicare whether the ESA use was for anemia induced by chemotherapy. Effective January 1, 2008, providers seeking reimbursement for ESA claims other than for patients with End-Stage Renal Disease had to include a "modifier" indicating that the anemia was induced by chemotherapy (EA), radiotherapy (EB), or other, which would include anemia caused by CKD (EC). Medicare Claims Processing Manual, ch. 17 § 80.9.

58.   The mandatory use of these billing modifiers is the mechanism by which Medicare seeks to prevent reimbursement for ESA treatment for cancer patients with hemoglobin at 10 g/dL or greater. Where a provider indicates that ESAs were used to treat anemia caused by chemotherapy (EA) in patients with hemoglobin at or over 10, those claims will be denied. Medicare Claims Processing Manual, ch. 17 § 80.12.[25]

---

[25] The ESA treatment duration for each course of chemotherapy includes the 8 weeks following the final dose of chemotherapy. Medicare Claims Processing Manual, ch. 17 § 80.12.

18

59.     Further, Medicare guidance directs that ESA claims for CKD patients (modifier

EC) will be denied for "any anemia in cancer or cancer treatment patients."[26]

60.     The combined effect of these Medicare regulations is to deny coverage when

ESAs are used on chemotherapy patients beyond the Hg 10 g/dL threshold, or used to treat

CKD-induced anemia in chemotherapy patients.

61.     Medicare regulations are clear that ESA use on chemotherapy patients is covered

only when administered pursuant to the restrictive limitations applicable to such patients,

regardless of whether such patients may or may not also have CKD.

## E.     In 2010 The FDA Instituted A REMS Program To Ensure That Cancer Patients Understood The Risks The Drug Poses To Their Health And That FDA Limitations For The Drug Were Strictly Followed

62.     The Food and Drug Administration Amendments Act of 2007 granted the FDA

authority to require a drug manufacturer to develop and implement a Risk Evaluation and

Mitigation Strategy (REMS) program if the FDA determines it is necessary to ensure that the

benefits of a drug outweigh its risks.

63.     On February 16, 2010, the FDA took the unusual step of ordering that a REMS

program be implemented for ESA use on cancer patients to "inform[] patients about the risk of

shortened overall survival and/or increased risk of tumor progression or recurrence when [ESAs

are] used to treat anemia due to concomitant myelosuppressive chemotherapy."[27]

64.     Under this program, physicians are only permitted to dispense ESAs to cancer

patients once a risk and benefit discussion has occurred between the patient and the treating

---

[26] Local Coverage Article: Erythropoiesis Stimulating Agents (ESA) – Supplemental Instructions Article (A52856) (National Government Services, Inc.).  Local Coverage Articles are supplemental guidance for complying with Medicare coverage and reimbursement requirements.

[27] *See e.g.,* Risk Evaluation and Mitigation Strategy (REMS) BL 103234 Epogen/Procrit (Epoetin Alfa) at 1 (Initial Approval 02/2010).

physician, the physician has signed a form attesting to the fact this discussion took place, and the patient has signed a form acknowledging this discussion occurred and the patient's understanding of the risks involved.

65.     The REMS program also required that healthcare providers who both prescribe and dispense ESAs obtain a special certification. The certification program, called the ESA APPRISE (Assisting Providers and cancer Patients with Risk Information for the Safe use of ESAs) Oncology Program, requires completion of specialized training that provides instruction on the risks that Procrit poses for cancer patients.

66.     The ESA APPRISE Oncology Program Patient and Healthcare Provider Acknowledgment Form that must be signed by both the provider and the patient contains the express warning directed at cancer patients, "**<u>Risks:</u>** ESAs may make my tumor grow faster and I may die sooner."

67.     As part of the ESA APPRISE program, both Amgen and J&J provided a Frequently Asked Questions resource on the ESA APPRISE website.  One such question was carefully crafted to provide an answer that limits the scenarios in which the ESA APPRISE Oncology Program is applicable:

> *"As a nephrologist treating patients with ESAs for the anemia of Chronic Kidney Disease (CKD) who may also have cancer or are cancer survivors, do I need to enroll in the ESA APPRISE Oncology Program? No, the ESA APPRISE Oncology Program is required for HCPs prescribing ESAs for the anemia resulting from cancer chemotherapy."*

68.     Notably, this answer does <u>not</u> indicate that <u>oncologists</u> treating patients for anemia that results from their chemotherapy, who may also happen to have some level of kidney impairment, do not have to participate in the ESA APPRISE Oncology Program.  Instead, the answer confirms that the ESA APPRISE Oncology Program requirements apply when any provider prescribes Procrit to any patient whose anemia is caused by chemotherapy.

69.     In 2017, the FDA determined that after seven years of the REMS program for ESAs, the risks of decreased survival and/or tumor progression or recurrence were sufficiently known by practitioners to discontinue the REMS requirements governing the use of ESAs on chemotherapy patients.  Nowhere, however, did the FDA indicate it had undergone any investigation into unlawful "switching" of a patient's diagnosis to anemia due to CKD from anemia due to chemotherapy.  The FDA has noted, however, that the prescribing information for ESAs continue to disclose the serious risks of shortened overall survival and tumor progression.[28]

## VII.  **FACTUAL ALLEGATIONS**

**A.     The 2007 NCD Threatened CCBD's Profit Stream From Administering ESAs To Its Cancer Patients**

70.     ESAs are lucrative drugs for oncology practices such as CCBD, who use them to treat chemotherapy-induced anemia.

71.     During the relevant time period, J&J sold Procrit to community-based oncologists like CCBD through a contract that typically covered only Procrit and a chemotherapy drug, Doxil.

72.     These contracts provided community oncologists with increasingly profitable discounts off the Average Sales Price (ASP) if an oncologist met negotiated volume hurdles.  By increasing their utilization of the drug, the spread between what each vial of Procrit cost the oncologist and the amount the government reimbursed for it would grow.

---

[28] *See e.g.,* FDA website, "Information on Erythropoiesis-Stimulating Agents (ESA) Epoetin alfa (marketed as Procrit, Epogen), Darbepoetin alfa (marketed as Aranesp)," available at https://www.fda.gov/Drugs/DrugSafety/ucm109375.htm (last visited Nov. 6, 2018).

73.      Volume hurdles in 2012, for instance, were approximately $250,000 to $350,000 of Procrit sales per quarter.  The off-invoice discounts earned by oncologists under these contracts could exceed 50% of the ASP.

74.      Likewise, Amgen sold Aranesp to community-based oncologists as part of a bundle of drugs that cost far less than their respective Medicare reimbursement amounts.

75.      Thus, CCBD's ESA contracts, like those of other oncologists, included a direct financial incentive to over-utilize Procrit and Aranesp – the more it used, the greater its profits.

76.      The 2007 NCD threatened this profit stream by limiting the scope of Medicare reimbursement for cancer patients.

77.      By way of contrast, J&J typically sold Procrit to hospitals by way of an individual contract or the Value Opportunity Offer (VOO) contract, which bundled Procrit with other J&J drugs and products.  The financial impact of these contracts upon the hospital was accordingly determined by a combination of the prices and the usage of a range of drugs and products covered by the contracts.

78.      The financial incentives to identify ESA treatment as arising from CKD corrupted the medical judgment of oncologists practicing within oncology clinics, like CCBD, as opposed to within hospitals, and caused patients to receive ESAs when they otherwise would not. Hospital oncologists would derive no personal financial benefit from submitting these false claims, and largely declined to do so.

**B.      CCBD Responded By Falsely Submitting Claims To Medicare Stating That It Was Treating Its Cancer Patients For Chronic Kidney Disease Of Stage Three Or Higher**

79.      Reflecting general treatment standards and prescribing practices within nephrology, Medicare contractors issued reimbursement rules in effect as of 2008 that interpreted Medicare's coverage for Procrit to be limited to Stage 3 CKD and above, on the basis

22

that patients with Stages 1 and 2 CKD did not have renal impairment sufficient to warrant ESA treatment.[29]

80.     For example, the LCD presently applicable to Maryland (Part A) states as follows:

**Group B: Chronic Kidney Disease NOT on dialysis: Epoetin alfa/ Epoetin beta/Darbepoetin alfa/ Epoetin alfa-epbx (biosimilar)**

1. The hemoglobin level prior to initiation of ESA treatment is less than 10 g/dL (or the hematocrit is less than 30%).
   a. Serum creatinine is greater than or equal to 3 or
   b. Creatinine clearance is less than 60 ml/min, or
   c. Glomerular filtration rate (GFR) is less than 60 mL/min/1.73 m2.

This local policy defines the potential **eligibility** for coverage of ESAs in the treatment of anemia in patients with chronic renal failure/insufficiency. For this purpose, WPS adopts the National Kidney Foundation's Kidney Disease Outcomes Quality Initiative (NKF-K/DOQI) recommendation, derived largely from the NHANES III analysis. Patients with glomerular filtration rate (GFR) Grade III or higher, a GFR less than 60 ml/min/1.73m 2, should be evaluated for anemia and treated with an erythropoietic agent if appropriate and in accordance with the NKF *Guidelines for Anemia of Chronic Kidney Disease*.

LCD L34633 ("Erythropoiesis Stimulating Agents (ESAs)").

81.     To affect its fraudulent scheme, CCBD represents on Medicare claims forms that its cancer patients have CKD Stage 3 (and anemia *caused by* CKD) when the patients' clinical results, such as GFR, do not support or in fact contradict that diagnosis.

82.     In Relator's experience working for Johnson & Johnson as a Medicare reimbursement specialist for Procrit, oncologists such as CCBD were successful in this approach since providers were not required to include the results of the underlying clinical tests that would support a CKD Stage 3 diagnosis (such as for GFR) on Medicare claims forms – just the anemia test results. Thus, they could submit the false claims, receive reimbursement for Medicare, and hope that they would not be audited (and even if they were, that the audit would only deny payment for some of their false claims).  The consequence of this scheme was that claims falsely

---

[29] *See e.g.*, Local Coverage Determination L25211 (National Government  Services) (restricting use on CKD patients not on dialysis to those with creatinine clearance less than 60ml/min or glomerular filtration rate (GFR) less than 60 ml/min/173 m2, which are the minimum levels of kidney function impairment to meet the definition of Stage 3 CKD); Local Coverage Determination L27492 (National Government Services) ("Note:  Patients with stage I and II [CKD] do not meet the creatinine clearance or GFR requirements in coverage criteria B.").

representing that a cancer patient had Stage 3 CKD were routinely submitted by oncologists to Medicare.

83.     Indeed, physicians generally understood that most patients who actually do have Stage 3 CKD do not get anemia as a consequence thereof, especially those whose GFR is between 45-59.

84.     Furthermore, in cases of chemotherapy-induced anemia, it is the chemotherapy itself that causes a temporary anemic condition that will eventually disappear after chemotherapy has ended.  However, once the course of chemotherapy ended, CCBD and other oncologists chose not to see if the patient's hemoglobin level would rise on its own after chemotherapy and in the absence of ESAs. Instead, having chosen to blind themselves to this important clinical information, they would promptly switch the diagnosis to anemia caused by Stage 3 CKD and thus the administration of the ESAs was never interrupted. Of course, these physicians did not want to know if the patients' hemoglobin would rise on its own. Their goal was to circumvent the 2007 NCD and find a reason to keep administering ESAs indefinitely.

85.     This approach was also contrary to industry standards dictating that a diagnosis of CKD be made on the basis of sustained clinical findings over a period of at least three months. This industry standard reflects the fact that acute kidney impairment – such as can be caused by chemotherapy agents – is often temporary and is not indicative of underlying CKD.

86.     Even where patients legitimately have Stage 3 CKD, the standard of practice among nephrologists is not to begin treatment of anemia with ESAs at such an early stage.  A 2014 study found that just 26.5% of Stage 3 CKD patients and 20.7% of Stage 4 CKD patients

with anemia reported receiving anemia treatment.[30]  That nephrologists generally do not prescribe ESAs to their Stage 3 CKD patients with anemia strongly points to the fact that CCBD's judgment was corrupted when it did so, _especially_ since its patients had just completed chemotherapy treatment and CCBD had falsified its diagnoses of Stage 3 CKD in the first place.

87.     Standards of practice and common sense direct that nephrologists, and not oncologists, should drive treatment decisions for patients with CKD.  While care for CKD patients may sometimes be "fragmented" among a number of providers, industry consensus is that nephrologists should assume "leadership" of interdisciplinary teams.

88.     Following early detection of CKD, a comprehensive care plan would include a wide range of treatments other than just addressing anemia where present.  Some of these treatments, such as "delay progression" and "dietary counseling," should occur before anemia treatment.

89.     Notwithstanding that legitimate treatment for CKD should be comprehensive and nephrologist-driven, CCBD did not refer patients they claimed had CKD-induced anemia to nephrologists for treatment, but instead used the false diagnosis of CKD Stage 3 to perpetuate their administration of ESAs on cancer patients that the FDA and CMS had determined were not appropriate for such treatment.

90.     CCBD's switching of its patients from a chemotherapy-induced anemia diagnosis to a CKD-induced anemia diagnosis resulted in:

(a)     Circumvention of the 2007 NCD requirements that ESA treatment only be initiated or maintained at a hemoglobin level less than 10 g/dL (or a hematocrit level less than 30%).  Treatment with Procrit up to a hemoglobin level of 11-12 g/dL is permitted for CKD-induced anemia.

---

[30] Stauffer et al, "Prevalence of Anemia in Chronic Kidney Disease in the United States," PLOS ONE (Jan. 2014).

(b)      Circumvention of the 2007 NCD requirement that ESA treatment cease eight weeks after the end of the patient's chemotherapy.  There is no time period limitation for ESA treatment for CKD-induced anemia, and patients with CKD-induced anemia are often given ESA treatment for years. The patient consent forms were thus invalid because CMS did not contemplate chemotherapy patients taking Procrit more than eight weeks after the cessation of therapy.  Likewise, the physician form attesting to having fully and fairly disclosed the risks of Procrit to the patient was invalid as well.

(c)      Violation of Medicare billing regulations that require providers to include modifiers (EA, EB, EC) on claims and that deny coverage for ESA use to treat CKD-induced anemia where the patient has cancer or is undergoing cancer treatment.

(d)      Avoidance of the REMS requirement to obtain written patient consent for the administration of ESAs to cancer patients.  The REMS program does not require patients who are given ESAs for the treatment of CKD-induced anemia to sign a consent form.

(e)      The submission of claims for payment to the government which falsely assigned a diagnosis of Stage 3 CKD and Stage 3 CKD-induced anemia when the patient did not have Stage 3 CKD and, even with respect to patients who did meet the GFR threshold for Stage 3 CKD, falsely attributed anemia to the CKD.

## C.     CCBD Generates Millions Of Dollars Each Year In Medicare Reimbursement For ESA Use

91.     Primarily through its overuse of ESAs, CCBD has generated millions of dollars each year in Medicare reimbursements.

92.     In 2015, Defendant Boccia ranked #2 out of 157 in the State of Maryland for number of Part B services performed among Hematology & Oncology providers. Defendant Boccia received over $3.6 million from Medicare Part B in 2015 alone, making him the second-highest Medicare recipient among Maryland Hematology & Oncology providers. Injections of ESAs were the third-most frequently performed service by Defendant Boccia in 2015 and resulted in over $1.3 million of his Medicare claims and approximately $500,000 in Medicare Part B funds received in that year alone.[31]

---

[31] https://projects.propublica.org/treatment/doctors/1881663284

93.     Defendant Boccia's practice partner at CCBD, Victor Priego, M.D., ranked just behind him in 2015, at #3 in the State of Maryland for number of Part B services performed among Hematology & Oncology providers and for total Medicare payments received ($3.57 million).  Injections of ESAs were the third-most frequently performed service by Dr. Priego in 2015 and resulted in over $1.4 million of his Medicare claims and approximately $550,000 in Medicare Part B funds that year.[32]

**D.     False Claims To Medicare And Other Government Healthcare Programs**

94.     Individual physicians submit claims to Medicare and other government healthcare programs on Form CMS-1500.

95.     Form CMS-1500 requires a certification by the provider that, "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations."

96.     Providers are required to indicate on Form CMS-1500 the diagnosis that relates to the service performed.  Medicare Claims Processing Manual, ch. 26 § 10.4 Item 21 ("Enter the patient's diagnosis/condition....all physician and nonphysician specialties [] use diagnosis codes to the highest level of specificity for the date of service. Enter the diagnoses in priority order."); Item 24E ("This is a required field. Enter the diagnosis code reference number or letter [] as shown in item 21 to relate the date of service and the procedures performed to the primary diagnosis.")

---

[32] https://projects.propublica.org/treatment/doctors/1003875295

97.     The "Local Coverage Article:  Erythropoietin Stimulating Agents (ESA) –
Supplemental Instructions Article (A44399)," directs that "[t]he diagnosis code(s) must best
describe the patient's condition for which the service was performed."[33]

98.     Effective January 1, 2008, providers seeking reimbursement for ESA claims other
than for patients with End-Stage Renal Disease had to include a "modifier" indicating that the
anemia was induced by chemotherapy (EA), radiotherapy (EB), or by non-chemotherapy or
radiotherapy causes (EC).  Medicare Claims Processing Manual, ch. 17 § 80.9.

99.     In violation of these requirements, Defendants submitted claims to Medicare that
falsely indicated the primary or appropriate diagnosis on Form CMS-1500.  Specifically, these
claims and patient medical records underlying them falsely indicated that certain patients had
CKD of Stage 3 or higher and that ESAs were administered to those patients for the treatment of
anemia caused by CKD, rather than for the treatment of anemia induced by chemotherapy.

---

[33] Effective October 1, 2015, A44399 was replaced with A52856, which also contains the referenced
quote.

## VIII.  COUNTS

### Count I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

100.   Relator re-alleges and incorporates each allegation in each of the preceding

paragraphs as if fully set forth herein and further alleges as follows:

101.   By virtue of the acts described above, Defendants "knowingly present[ed], or

caus[ed] to be presented, false or fraudulent claims for payment or approval" in violation of 31

U.S.C. § 3729(a)(1)(A).

102.   The United States, unaware of the foregoing circumstances and conduct, and in

reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those

claims and has been damaged in an amount to be proven at trial.

### Count II
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

103.   Relator hereby incorporates and re-alleges each allegation in paragraphs 1 through

99 as though fully set forth herein, and further alleges as follows:

104.   By virtue of the acts described above, Defendants have "knowingly ma[de],

us[ed], or caus[ed] to be made or used, a false record or statement that was material to false or

fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B).

105.   The United States, unaware of the foregoing circumstances and conduct, and in

reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those

claims and has been damaged in an amount to be proven at trial.

### Count III
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

106.    Relator hereby incorporates and re-alleges each allegation in paragraphs 1 through 99 as though fully set forth herein, and further alleges as follows:

107.    By virtue of the acts described above, Defendants have "knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit" money to the United States in violation of 31 U.S.C. § 3729(a)(1)(G).

### Count IV
### Maryland False Health Claims Act
### Md. Code Ann., Health-General § 2-602(a)(1)

108.    Relator hereby incorporates and re-alleges each allegation in paragraphs 1 through 99 as though fully set forth herein, and further alleges as follows:

109.    By virtue of the acts described above, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of Md. Code Ann., Health-General § 2-601(a)(1).

110.    The State of Maryland, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

### Count V
### Maryland False Health Claims Act
### Md. Code Ann., Health-General § 2-602(a)(2)

111.    Relator hereby incorporates and re-alleges each allegation in paragraphs 1 through 99 as though fully set forth herein, and further alleges as follows:

112.    By virtue of the acts described above, Defendants have knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims in violation of Md. Code Ann., Health-General § 2-601(a)(2).

113.    The State of Maryland, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## Count VI
### Maryland False Health Claims Act
### Md. Code Ann., Health-General § 2-602(a)(8)

114.    Relator hereby incorporates and re-alleges each allegation in paragraphs 1 through 99 as though fully set forth herein, and further alleges as follows:

115.    By virtue of the acts described above, Defendants have knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Maryland in violation of Md. Code Ann., Health-General § 2-602(a)(8).

## Count VI
### Maryland False Health Claims Act
### Md. Code Ann., Health-General § 2-602(a)(9)

116.    Relator hereby incorporates and re-alleges each allegation in paragraphs 1 through 99 as though fully set forth herein, and further alleges as follows:

117.    By virtue of the acts described above, Defendants have knowingly made false or fraudulent claims to the Maryland Medicaid program in violation of Md. Code Ann., Health-General § 2-602(a)(9).

## PRAYER FOR RELIEF

WHEREFORE, Relator demands that judgment be entered in favor of the United States and the State of Maryland and against Defendants for the maximum amount of damages and

31

such other relief as the Court may deem appropriate on each Count. This includes, with respect to the federal FCA, three times the amount of damages to the United States plus civil penalties of no more than $11,000 and no less than $5,500 for each false claim before or on November 2, 2015, and civil penalties of no more than $22,363 and no less than $11,181 for each violation after November 2, 2015, and any other recoveries or relief provided for under the Federal FCA. This Request also includes, with respect to the Maryland's false claims act statute, the maximum damages, the maximum fines or penalties, and any other recoveries or relief provided for or permitted by law.

Further, Relator requests that she receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States and the State of Maryland, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that her award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

DATED:  November 19, 2018        Respectfully submitted,

COHEN MILSTEIN SELLERS & TOLL PLLC

By:

Andrew N. Friedman
MD Bar No. 14421
1100 New York Avenue, NW, 5th Floor
Washington, D.C. 20005
(202) 408-4600 (p)
(202) 408-4699 (f)
afriedman@cohenmilstein.com

COHEN MILSTEIN SELLERS & TOLL PLLC
Gary L. Azorsky
Jeanne A. Markey
Raymond M. Sarola
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
(267) 479-5700 (p)
(267) 479-5701 (f)
gazorsky@cohenmilstein.com
jmarkey@cohenmilstein.com
rsarola@cohenmilstein.com

THE COCHRAN FIRM DC
David Haynes
1100 New York Avenue NW
Washington, DC 20005
(202) 682-5800 (p)
dhaynes@cochranfirm.com

*Counsel for the Relator*

33

## CERTIFICATE OF SERVICE

I hereby certify that I will cause a copy of the above Complaint to be served on the following counsel by mail:

The Honorable Matthew D. Whitaker
Acting United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

The Honorable Robert K. Hur
United States Attorney for the
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

The Honorable Brian E. Frosh
Attorney General of Maryland
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202

Allen F. Loucks
Assistant United States Attorney
United States Attorney's Office for the
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

DATED: _11/26_, 2018

_____
Raymond Sarola

1